OREGON SHORT-LINE & U. N. RY. CO. v. NORTHERN PAC. R. CO.

(Circuit Court of Appeals, Ninth Circuit. April 12, 1894.)

No. 115.

1. INTERSTATE COMMERCE LAW—CONNECTING LINES—DISCRIMINATION.

The provision of the interstate commerce law forbidding discrimination against any locality or description of traffic (24 Stat. 380, § 3, cl. 1) is for the protection of the locality or traffic itself, and cannot be invoked by a carrier as against a connecting carrier which discriminates, in the matter of requiring prepayment of freight and car mileage, between goods which come from different sections of the country over the line of the complaining carrier. 51 Fed. 465, affirmed.

2. SAME.

The provision requiring carriers to afford all reasonable, proper, and equal facilities for interchange of traffic, and forbidding discrimination between connecting lines (section 3, cl. 2), is not violated by receiving and forwarding, without prepayment of freight or car mileage, cars of other companies containing goods coming from one locality, and refusing to do so, unless prepayment is made, when the goods are from a different locality. 51 Fed. 465, affirmed.

3. SAME—NORTHERN PACIFIC RAILROAD CHARTER.

The provision in the charter of the Northern Pacific Railroad Company requiring that company to permit other railroad companies "to form running connections with it on fair and equitable terms" (Act July 2, 1864, § 5), includes only such arrangements as to the time of arrival and departure of trains, and as to stations, platforms, and other facilities, as will enable companies desiring to connect to do so without detriment or serious inconvenience, and does not apply to alleged discrimination in the matter of prepayment of freight and car mileage on goods tendered by connecting lines. 51 Fed. 465, affirmed.

Appeal from the Circuit Court of the United States for the District of Oregon.

This was a suit by the Oregon Short-Line & Utah Northern Railway Company to enjoin the Northern Pacific Railroad Company from continuing to make an alleged unlawful discrimination against complainant in the matter of receiving and forwarding freight tendered by it at Portland, Or. The circuit court denied the injunction, and dismissed the bill. 51 Fed. 465. Complainant appeals.

W. W. Cotton, John M. Thurston, and Zera Snow, for appellant.

Dolph, Bellinger, Mallory & Simon, for appellee.

Before McKENNA, Circuit Judge, and KNOWLES and HAWLEY, District Judges.

McKENNA, Circuit Judge. As is said by appellant's counsel, "the controversy between the parties in this suit is mainly one of law, and not of fact;" and, succinctly stating the relations of the parties, also said: "The appellee owns and operates a line of railroad extending from St. Paul, Minnesota, to Portland, Oregon, passing through Tacoma and other points in the state of Washing-

ton, on Puget sound. The appellant owns and operates a line of railway connecting with the lines of the appellee at Portland, and extending from Portland to Granger, Wyoming, where a connection is made with the lines of the Union Pacific Railway, extending thence to various points on the Missouri river. The appellee and appellant are therefore competing lines in the transportation of traffic from Missouri river points to places upon the Pacific coast. The only rail connection which the lines of the appellant have from Portland to Puget sound is by means of the lines of the appellee." The connection, however, is not direct, but through the lines of the Northern Pacific Terminal Company. The latter, however, are leased to appellee. We shall consider the case as if the connection was direct.

The bill is very long. In substance, it charges appellee with discriminating against traffic, passengers and freight, starting east of a given meridian, and destined for Puget sound points via Portland, Or., and also discriminating against localities situate east of a given meridian. There is also a charge that facilities are given to the Southern Pacific Company which are denied to appellant. This charge is not sustained by the evidence, and may be dismissed from consideration. The discrimination against traffic and localities consists in receiving goods at Portland which start west from the meridian in cars other than those of appellee without requiring payment to the owners of the cars of the usual mileage, and without exacting prepayment of freight, while goods which start east of the meridian are denied these facilities; and in receiving through tickets issued by appellant to passengers starting west of the meridian, and refusing such tickets issued to passengers starting east of the meridian; the condition and other circumstances of the freight and passengers being the same. The action, appellant contends, is contrary to the custom and practice of railroads which have the force of law, and infringes section 3 of the interstate commerce act, so called. This section is as follows:

"Sec. 3. That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. Every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith and shall not discriminate in their rates and charges between such connecting lines. But this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business."

The first part of this section prohibits preference to persons, firms, or corporations, and to localities and traffics, and prohibits the subjecting of either to prejudice or disadvantage. The evidence shows that there was no preference given any person, firm, or corporation in the sense of this section, and no traffic or locality is complaining,

unless the complaint of appellant is such.    But we do not think it is competent for a railroad company to appropriate the grievance of a traffic or locality under section 3, and complain on account of it.

In Express Cases, 117 U. S. 1, 6 Sup. Ct. 542, 628, certain railroad companies made contracts with certain express companies granting them facilities on their trains, refusing contracts and facilities to other express companies.    The supreme court sustained the railroad companies, reversing the judgment of the circuit court.    The court said:

"The question is not, whether these railroad cars must furnish the general public with reasonable express facilities, but whether they must carry these particular express carriers for the purpose of enabling them to do an express business over the lines."

And again, on page 28, 117 U. S., and page 556, 6 Sup. Ct., the court says:

"If the general public were complaining because the railroad companies refused to carry express matter themselves on their passenger trains, or allow it to be carried by others, different questions would be presented."

And the court further said:

"So long as the public are served to their reasonable satisfaction, it is a matter of no importance who serves them."

This language is applicable to the case at bar.    Whether appellant shall unload its cars at Portland as an alternative to paying car mileage, however it may involve expense or inconvenience to appellant, is not necessarily the concern of the freight or its shippers or the locality of its shipment.    When it becomes such, a complaint will no doubt be made.    None now is made, nor does it appear that either the traffics or localities discriminated against are even competitors. In Hozier v. Railroad Co., 1 Railway & Canal Traffic Cas. p. 30, of the traffic act, it was said:

"It provides for giving undue preference to parties pari passu in the matter, but you must bring them into competition in order to give them an interest to complain."

In Swindon M. & A. R. Co. v. Great Western R. Co., 4 Railway & Canal Traffic Cas. 349, it is implied that to make undue preference, traffic must go between same places.    And in 1 Railway & Canal Traffic Cas. 32, the same rule is asserted as to passengers.    To construe the section so as to authorize a railroad to complain for a traffic or locality would seem to confound the distinctions made by it, and make the second part of it superfluous.    The regulation of the roads was undoubtedly in the interest of their customers, but it left them powers and privileges, between themselves, which might affect their customers; indeed, left powers and privileges in them as regards their customers, because all favor and all discrimination is not forbidden, even between them.

This view takes out of consideration the rights of the traffic originating and the rights of localities situate east of a given meridian, and confines the inquiry to the rights and obligations of the railroads between themselves under the second paragraph of the section.

As an aid to the interpretation of this paragraph, a number of cases which arose under the English act are cited by appellant.

They are not of much assistance. The English act is different from ours. It is fuller and more precise. There is little or no ambiguity about it. At any rate, our act is different, and the difference has been construed as substantial. Little Rock & M. R. Co. v. St. Louis, I. M. & S. Ry. Co., 41 Fed. 559, and Kentucky & I. Bridge Co. v. Louisville & N. R. Co., 37 Fed. 567. See, also, the first decisions of the interstate commerce commission. But in Little Rock & M. R. Co. v. East Tennessee, V. & G. R. Co., 3 Interst. Commerce Com. R. 1, the commission holds that our act was intended to effect similar results, but omitted the machinery to accomplish them. It would seem like better reasoning to assume that, if congress had intended the same results as the English act, having it and its history and construction before them, it would have adopted its language and machinery, and made the results certain.

We get little light, therefore, from the English act or decisions, and not much from the debates in congress. There was little or no comment on section 3. Section 4 (the long and short haul provisions) appeared to have engaged almost exclusive attention. Senator Cullom, who had charge of the bill in the senate, said:

"The third section is broader and more general in its terms, and should perhaps have been made the second section, as it contains a general prohibition of every variety of unjust discrimination. The section covers all subjects. The first paragraph prohibits the giving of any undue or unreasonable preference to any particular person or locality, or to any particular description of traffic in any respect whatever. * * * The language adopted in this paragraph is substantially that of the English statute on the subject, which has been repeatedly construed by the English courts, so that its meaning has been practically established. The second part of the section is modeled in part upon the English and in part upon similar statutes in several of the states. Its purpose is to require railroads to furnish connecting roads all reasonable and proper facilities for the interchange of traffic that may be necessary for the convenience of the public, and to prevent one road, or a combination of roads, from 'freezing out' connecting lines by refusing to accept from it, or deliver traffic to it, upon any terms, as has been done." Senator Cullom's Speech Explaining the Bill, section 1, p. 3577, Cong. Rec. 49th Cong., April 15, 1886.

This is not very explicit. The first part of section 3, he says, is adopted from the English statute, and that its meaning has been practically established. So far, so good. But the second part is selected from the English and certain states' statutes, and, besides, very important language is omitted which is in the English statute. And, as Justice Field states:

"Whenever an intention has been manifested, in the creation of railway charters, that a connecting company shall have the power to run its cars over the lines of another, or to require one company to haul over its lines the cars of another, such intention has been expressed in unequivocal terms, such as is found in the constitutions or statutes of several of the states respecting railway companies, which is substantially in these terms: 'And they shall receive and transport each other's passengers, tonnage, and cars, loaded or empty, without delay or discrimination.'"

Senator Cullom stated the evil which was to be remedied. Railroads had refused to accept or deliver traffic on any terms, and thereby froze out connecting lines. This the act was intended to correct, and did correct. But confining it to this, appellant contends,

makes no advance on the common law; and that, under the latter, the appellee was bound to carry freight in its own cars, and that, therefore, congress intended to impose a duty beyond that. This is begging the question somewhat, and does not consider the distinction between rights and remedies; but whether the common law required a railroad company to carry freight delivered to it by another we need not consider. The fact was, as said by Senator Cullom, it was not done, and the act was deemed necessary to compel it. Whether common-law rights were enlarged thereby or only affirmed we need not decide. If we assume the former, as appellant has, we cannot also assume that the independence of the roads between themselves was entirely destroyed. Not all preference is prohibited,—only undue and unreasonable preference; and the facilities which are required to be granted have two limitations: They do not include tracks and terminal facilities, and they must be reasonable and proper. How must the latter be determined? Surely not only of themselves, but in the circumstances, and these must include the proper interests of the road from which the facilities are required. Any other construction would be too abstract, and we concur in the opinion of the learned justice who rendered the judgment of the circuit court "that the refusal to transport freight on foreign cars, where the freight originated east of the ninety-seventh meridian, when its own cars were not in use, but were free to be employed in the transportation desired, or was made where a transfer of freight would not have been injurious to it, can in no respect be deemed an unreasonable discrimination against complainant, or a denial to it of reasonable and proper facilities."

Of course, if appellant's construction of section 3 be correct, and it can compel appellee to receive one car, by the same right it may compel the receipt of many, and what more would be necessary to take the use of tracks? We think nothing. The attachment of the locomotive would only affect the degree of use. The same conclusion was reached after a careful consideration of all the cases by the circuit court of the eighth circuit in Little Rock & M. R. Co. v. St. Louis, I. M. & S. Ry. Co., 59 Fed. 408. A construction which permits the use of tracks we are forbidden to entertain.

Of the complaint of appellant that appellee denies it facilities for passenger traffic in refusing to honor tickets or coupons for passage over appellee's lines north of Portland issued by it, the lower court said:

"It is sufficient to say there is no evidence to support it. The practice of railway companies operating connecting lines to honor tickets or coupons for passage over their respective lines issued by a connecting company, which is very general, is founded entirely upon arrangements between the connecting companies. In the absence of such arrangements, there is no obligation on the part of either company to honor tickets issued by the other. All the witnesses examined on this point concur in their statements in this respect."

We concur in this statement and the conclusion of the court.

Appellant further urges that the facilities which it asks of appellee are required to be given by the fifth section of the act incorporating the Northern Pacific Railroad Company, which contains the following provision:

"It shall be the duty of the Northern Pacific Railroad Company to permit any other railroad which shall be authorized to be built by the United States or by the legislature of any territory or state in which the same may be situated to form running connections with it on fair and equitable terms."

In answering this contention we can do no better than to adopt the language of Justice Field:

"The running connection," he said, "which must be permitted by the defendant is not, as contended by complainant's counsel, a running over its line, but only in connection with it, a provision intended to secure the transportation and exchange of freight between connecting lines, and not the use of each other's roads by the cars of such companies. * * * We are of opinion that a running connection of one road with another, within the meaning of the defendant's charter, only includes such arrangements as to the time of arrival and departure of trains, and as to stations, platforms, and other facilities, as will enable companies desiring to connect to do so without detriment or serious inconvenience."

The effect of a custom among railroads to grant the facilities contended for we have not considered, because the existence of such a custom is not established by the evidence. The finding of Justice Field on the facts seems to be concurred in by Judge Deady. His dissent is based entirely on a different interpretation of section 3 of the interstate commerce act, and of section 5 of the act incorporating the Northern Pacific Railroad Company.

Judgment is therefore affirmed.